## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

**LARRY KLAYMAN,**

          **Plaintiff,**

**v.**

**LAWRENCE R. LOEB,**

          **Defendant.**

**Civil Action No.  5:13 CV 0267**

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff has been forced to bring this civil rights action against Defendant Lawrence Loeb ("Defendant") 42 U.S.C. §1983, seeking damages, injunctive and other equitable relief as a result of Defendant's deliberate, malicious, and hateful conduct and treatment of Plaintiff. Defendant, a lawyer and not a judge or judicial officer who presided over Plaintiff's separate family court hearing, engaged in a vicious personal attack against Plaintiff by rendering an unprecedented 93-page, single-spaced recommended decision, replete with malicious, vindictive, and hate-filled false findings including, most egregiously, his manufactured "finding," absent any basis or support, alleging that Plaintiff had inappropriately touched his children, despite the the fact that Plaintiff was exonerated of any such wrongdoing.

Clearly driven by his own antipathy towards Plaintiff's religious, legal and political advocacy, Defendant's purported "finding" was made solely to destroy Plaintiff, both personally and professionally, in order to stifle, if not snuff out, Plaintiff's conservative, religious, legal and political activism while effectively thwarting Plaintiff from engaging in any further conservative legal and political advocacy. In 2003, Plaintiff ran for the U.S. Senate in Florida's Republican Primary, during which time he maintained a campaign headquarter in this district. Compl. ¶5. In addition to residing in this district and the state of Florida, Plaintiff continues to be legally and

politically active in this state, even having established a citizen's grand jury in Ocala, Florida. See www.citizensgrandjury.com; Compl. ¶5. In 2003, Plaintiff ran for the U.S. Senate in Florida's Republican Primary, during which time he maintained a campaign headquarter in this district. Compl. ¶5. In addition to residing in this district and the state of Florida, Plaintiff continues to be legally and politically active in this state, even having established a citizen's grand jury in Ocala, Florida. See www.citizensgrandjury.com; Compl. ¶5. Defendant issued his "findings" with full knowledge and intention that it would be published nationally, internationally, and in this district, where Plaintiff has substantial connections and ties, and that his false "findings" would severely harm Plaintiff in his trade, profession, and personal life, as Plaintiff is a public figure with a highly known for his legal and political activism *(www.freedomwatchusa.org),* Thus, Defendant's unlawful and spiteful acts, engaged in by his own personal vendetta against Plaintiff, has given rise to Plaintiff's claims that his constitutionally protected freedom of religion and speech were violated and that Defendant deprived him of due process and equal protection under the law.

Additionally, Defendant mistakenly treats this case as an appeal when, in fact, this is clearly and distinctly a civil action brought against Defendant for his intentional constitutional violations and deprivations of Plaintiff's rights, pursuant to 42 U.S.C. §1983. Defendant's failure to recognize the distinction between an appeal and a civil rights action in their Motion to Dismiss is clearly evidenced by Defendant's drawn out discussion of irrelevant procedural matters as well as their unsubstantiated implication that Plaintiff is disputing Defendant's prior order. As such, Defendant's Motion to Dismiss not only lacks merit but also fails to recognize the obvious fact

this is a distinct civil action, not an appeal of Defendant's prior order. As such, Defendant's

Motion to Dismiss should be denied in its entirety, in the event that it is not stricken.[1]

## **STATEMENT OF FACTS**

Plaintiff is a citizen of the state of Florida, with two minor children currently living with

his ex wife Stephanie Ann Luck (now DeLuca) in Ohio. Compl. ¶5**.** Plaintiff is an attorney who

has practiced law within Florida for 36 years and is continuously a member in good standing of

The Florida Bar. Plaintiff, a conservative activist, has gained national exposure through his high

profile lawsuits against the Clinton, Bush, and Obama administrations, as well as other high-

profile public interest endeavors.  *Id.*  In 2003, Plaintiff ran for the U.S. Senate in Florida's

Republican Primary, during which time he maintained a campaign headquarter in this district.

Compl. ¶5. In addition to residing in this district and the state of Florida, Plaintiff continues to be

legally and politically active in this state, even having established a citizen's grand jury in Ocala,

Florida. See www.citizensgrandjury.com; Compl. ¶5.

Plaintiff is also the author of a book entitled, "Whores: Why and How I came to Fight the

Establishment," which is principally about Plaintiff's years fighting the Clintons and other

unethical politicians and government officials. Compl. ¶6. Moreover, in the book, Plaintiff

discusses how and he came to Christ, as a Jew who believes in Jesus Christ as Lord and Savior

and the Son of God. Compl. ¶6. Defendant was provided a copy of Plaintiff's book to read, and

---

[1] Defendant seeks to have Charles E. Hannan ("Hannan"), Assistant Prosecuting Attorney for Cuyahoga County Prosecutor's Office, legally represent him in this civil action, despite the significant role of the Cuyahoga County Prosecutor's Office in the prior custody case, ultimately exonerating Plaintiff. As such, Plaintiff respectfully requests that this Court strike Defendant's Motion to Dismiss, particularly as there is currently pending before this Court a Motion to Disqualify Defendant's Counsel. Thus, this Court should not entertain Defendant's Motion to Dismiss until the issue of disqualifying Defendant has been resolved.

thus had full knowledge of Plaintiff's religious and political beliefs, which were contrary to his own views and practices.

Defendant, a Jewish, liberal democrat, was assigned to preside over Plaintiff's custody proceeding and was responsible for issuing the recommended findings for the presiding judge.[2] More specifically, in the summer of 2007, Plaintiff was forced to file for custody of his children in the Court of Common Pleas for Cuyahoga County ("Court of Common Pleas") (Case No. DR-07-316840) when his former wife, Ms. Luck, unilaterally denied Plaintiff access to his children without a court order and violated the parties' Consent Marital Agreement. Compl. ¶8. In addition, Ms. Luck failed to timely inform Plaintiff about a serious accident involving their young son, Lance, that took place when Ms. Luck effectively left Lance unsupervised at a public pool and further refused to provide Plaintiff with any medical information regarding their son's accident and injuries. *Id.*

During the first status conference of the custody proceeding, the court explicitly directed Ms. Luck that she must comply with the terms of the parties' Consent Settlement Agreement and abide by the previously agreed upon visitation schedule. Compl. ¶9. Just days after this admonishment by the court, Ms. Luck contemptibly falsely alleged that Plaintiff had sexually abused their son. *Id.* As a result of the false accusations, a complaint was filed with the Department of Children and Families (DCF). *Id.* Not only were these false allegations made out of the blue and years after the alleged manufactured events supposedly took place, but were conveniently brought forward by Ms. Luck during a highly contested custody matter. *Id.*

Most significantly, Plaintiff was exonerated of any such wrongdoings. Compl. ¶12. Specifically, the DCF concluded that Ms. Luck's allegations were "unsubstantiated." Compl.

---

[2] Notably, Defendant is an attorney appointed to administer to family law matters and is distinctively not a judge or even judicial officer. Compl. ¶13.

¶12. Plaintiff also voluntarily took a polygraph examination, which he easily passed. *Id.* Similarly, the district attorney, after a thorough investigation was conducted by the sheriff's office, empathetically declined to prosecute and, in fact, acknowledged that such false allegations made during the course of custody litigation is a common tactic by spouses who try to obstruct the other spouse's custody rights. Compl. ¶18. Moreover, various articles have been written about strategic use of false child sexual abuse allegations during such custody proceedings. For example:

- In an article entitled "The Nuclear Option: False Child Sexual Abuse Allegations in Custody Disputes", the author observes: "In acrimonious divorce and child custody disputes emotions are tense and tempers flare. Buoyed by litigation attorneys, each side engages in strategic maneuvers to gain the greatest legal advantage. Sometimes a parent, fearing the loss of control or custody over a child, crosses the ethically acceptable bounds of legal warfare. An unfortunate but all too frequently used tactic by mothers is to accuse the father of sexually molesting their child. The mere accusation is sufficient to strip the father of all of his custody rights and launch a criminal investigation. Even when no evidence is found to substantiate the allegation, family law courts typically "err on the side of caution" and award full custody to the mother. While national statistics reveal that the majority of all child abuse reports are legitimate, when such claims are made by the mother in the context of custody litigation, an estimated 77% of allegations are determined to be unfounded (Tong 2002). A false child sex abuse allegation made during child custody litigation is a destructive legal stratagem. Throughout the world, child sexual abuse is considered the ultimate crime. Not even murder generates the kind of raw emotional reaction that results from the sexual abuse of a child. Society acknowledges the innocence of children and responds to (alleged) child abusers with extreme prejudice. The power of the accusation alone is often enough for public opinion to impeach the character of the alleged child abuser and guarantee legal victory for the mother." http://www.mrcustodycoach.com/blog/false-allegations-child-sexual-abuse.

- Another article on the subject observes, "When you have a societal climate that portrays all males as potential sexual abusers and a family court system that has a propensity to err on the side of "caution" – the impact of a false allegation of sexual abuse is swift and severe. Further, even when you are totally exonerated – your life is never the same personally, professionally, and you're typically ostracized from your own community. Adding insult to injury – the false accuser is rarely punished." "Avoid False Accusations of Child Sexual Abuse." http://nolanchart.com/article2788-the-nuclear-option-false-child-sexual-abuse-allegations-in-custody-disputes.html

Other courts have addressed the issue of false claims of child sexual abuse and underscored how there is an epidemic in the family courts of making these false and outrageous claims to gain strategic advantages. Specifically:

- The Ohio Supreme Court observed: "**Not every child who says he or she has been abused has in fact been abused. Sometimes a child can be a pawn in power games and rivalries between significant adults in the child's world.** Sometimes the adults are willing to believe the worst about their adult adversaries and encourage, consciously or subconsciously, stories of abuse when abuse has not occurred." *State v. Storch* (1993) 66 Ohio St. 3d 280, 284-285.

- Second District Court of Appeals observed, "[O]ther courts in this state have noted that there is **a significant percentage of false allegations of sexual abuse in child custody disputes.**" *Mascorro v. Mascorro*, (2000) Ohio App. LEXIS 2437, at 10-11.

- The 6th Circuit Court of Appeals observed, "the introduction of sexual abuse charges into bitterly contested custody actions seems to have become epidemic. Yet, as one expert in this case testified, **such allegations are unsubstantiated in as many as eight of ten times**." *Kohlman v. Kohlman*, (1993) Ohio App. LEXIS 4481 at 16.

However, contrary to the tantamount evidence establishing the child abuse allegations against Plaintiff to be unsubstantiated, Defendant maliciously and falsely "found" Plaintiff to have "inappropriately touched" his children, without even a shred of evidence on the record. Compl. ¶4. Specifically, on June 9, 2010, Defendant issued an unprecedented 93-page, single spaced, recommended findings that was filled with invective and disdain, mocking, denigrating, and personally attacking Plaintiff through his manifest prejudicial remarks, even calling Plaintiff "evil" and his ex-wife "good." Compl. ¶18. As way of example, Defendant outrageously wrote:

- "[T]he fight would become one of apocalyptic proportions, **a struggle between the forces of good [Plaintiff's ex-spouse] versus the forces of evil [Plaintiff Klayman]**." (Decision at 3)

- "Since the social worker's conclusions were ultimately overruled by her supervisor and because he was not prosecuted, the Plaintiff **triumphantly concluded that he had never sexually abused his children**…." Decision at 19 (Emphasis added).

- **(Defendant disparaging and mocking Plaintiff as crazy).** "Plaintiff's allegations … say more about Plaintiff's imagination and view of the world than they do about the Defendant's parenting abilities or her as a person." Decision at 48 (Emphasis added).

- **(Personal Attack).** "The Plaintiff had to deny that it was, though, because to acknowledge that it was genuine would have ruined his carefully built-up fantasy that the Defendant deliberately kept him in the dark…" Decision at 81 (Emphasis added).

- **(Personal attack).** "The only conclusion that the Magistrate can reach from the record (sic) is either that **Plaintiff has an utterly perverse view of the Defendant, rooted in fantasy not reality,** or he deliberately hurled this calumny at her as a means of striking out against her." Decision at 53 (Emphasis added).

- **(Personal attack).** "The Plaintiff's side of the conversation makes for good reading, but again it is not the whole truth…." Decision at 73 (Emphasis added).

Defendant's outrageous and hateful manufacturing of facts demonstrates bias and prejudice, designed to be published in this district, nationally, and internationally, that is far beyond the pale and was maliciously intended to bury Plaintiff personally and professionally. Compl. ¶18. Interestingly, while presiding over Plaintiff's custody case, Defendant was fully aware that Plaintiff maintained opposing political and religious views, contrary to Defendant's beliefs and practices. Compl. ¶6. In fact, Defendant, who is a Jewish liberal Democrat, unlike Plaintiff, who is a conservative activist, took extreme offense to and in a disparaging way, mocked Plaintiff's religious beliefs. Specifically, Defendant views Plaintiff as a religious heretic, perceiving Plaintiff's religious beliefs to be, in effect, a "Jews for Jesus," and thus, dishonestly ridiculed and viciously attacked Plaintiff to the highest extent both on and off the record, as further evidenced by Defendant's recommended decision. Compl. ¶15.

Defendant clearly wrote his 93-page single-spaced diatribe with the malicious intent that its false "findings" would reach the public and be widely disseminated through written press, by the media, and on the internet to destroy Plaintiff. Even more egregiously, Defendant deliberately directed his hateful statements found in his recommended findings towards this state

and its residents, as Defendant was fully aware of Plaintiff's residence in and substantial contacts with Florida, knowing that Plaintiff would suffer the most harm from Defendant's unlawful conduct in this state. Compl. ¶17. Defendant's "findings" were, in fact, widely circulated throughout the local and national media, including internet publications that reach into this district such as City Pages, Phoenix New Times, Right Wing Watch of People For the American Way, Wonkette, and a large number of other publications and internet blogs, causing great harm to Plaintiff. Compl. ¶21.

It is, thus, clear that Defendant has unlawfully violated Plaintiff's constitutional rights, including his First Amendment rights, due process rights, and equal protection rights while acting under the color of authority of Cuyahoga County, Ohio. Specifically, Defendant violated Plaintiff's right to free speech and religion by punishing Plaintiff for his religious beliefs and conservative legal and political activism that did not coincide with Defendant's own religious and leftist political beliefs. Compl. ¶31. Even more, Defendant deprived Plaintiff of equal protection under the law by illegally discriminating against Plaintiff simply because of Plaintiff's religious, legal, and political conservative beliefs and practices. Compl. ¶36. As a direct and proximate result of the Defendant's violations of Plaintiff's constitutional rights, Plaintiff has suffered severe damages, including lost earnings, lost career and business opportunities, loss of reputation, humiliation, embarrassment, and severe mental and emotional anguish and distress. Compl. ¶28.

## **PERSONAL JURISDICTION**

A district court may exercise personal jurisdiction over a nonresident defendant, if: (1) the state's long-arm statute provides jurisdiction and (2) the defendant has sufficient minimum contacts with the forum state such that the exercise of jurisdiction would not offend traditional

notions of fair play and substantial justice in violation of the Due Process Clause of the

Fourteenth Amendment. Since Defendant falls within the ambits of Florida's long-arm statute

under numerous subsections of the statute and because Defendant has more than sufficient

minimum contacts with Florida, since his conduct was purposely directed at this state and this

action results from Plaintiff's injuries that arose out of such activities.

A. **Defendant Is Subject To Jurisdiction Under Florida's Long-Arm Statute.**

Florida's Long-Arm Statute, Fla. Stat. §48.193, states in pertinent part:

> "(1) Any person, whether or not a citizen or resident of this state, who personally or
> through an agent does any of the acts enumerated in this subsection thereby submits
> himself or herself and, if he or she is a natural person, his or her personal representative
> to the jurisdiction of the courts of this state for any cause of action arising from the doing
> of any of the following acts:
>
> > * * *
> > (b) Committing a tortious act within this state.
> > * * *
> > (f) Causing injury to persons or property within this state arising out of an act or
> > omission by the defendant outside this state, if, at or about the time of the injury,
> > either:
> > > * * *
> > > (2) Products, materials, or things processed, serviced, or manufactured by
> > > defendant anywhere were used or consumed within this state in the
> > > ordinary course of commerce, trade, or use…."

*(1) Jurisdiction is Proper Under Subsection (1)(b) of the Florida Long-Arm Statute*

Subsection (1)(b) of Florida's Long Arm statute provides jurisdiction when a defendant

commits a tortious act within the state. Moreover, in applying subsection (1)(b), a defendant's

physical presence is not necessary to commit a tortious act in this state but can occur through the

nonresident defendant's telephonic, electronic, or written communications <u>into</u> Florida." *Wendt*

*v. Horowitz,* 822 So. 2d 1252, 1260 (Fla. 2002) (emphasis added). However, the internet poses a

more pervasive communication medium for purposes of contemplating whether there is a

communication into the state. In addressing this complex issue, the Florida Supreme Court

concluded that allegedly defamatory material about a Florida resident placed on the Web and accessible in Florida constitutes an electronic communication into Florida when the material is accessed in Florida.

In applying the above principles, Defendant clearly falls within the ambits of the Florida Long Arm Statute, as Defendant's recommended findings were deliberately written and calculated to harm Plaintiff and his reputation. Defendant deliberately and maliciously issued his manufactured false "findings" with the knowledge and intent that his "findings" would, because of Plaintiff's status as a public figure, be disclosed to or uncovered by members of the media, who would inevitably publish it in this district, throughout the country, and internationally, given Plaintiff's high-profile legal and political activism and involvement in matters of national concerns and in the public interests. See www.freedomwatchusa.org. Indeed, the recommended findings were widely circulated through the media and on the internet, and did, in fact, reach into this district through numerous publications and internet blogs, severely harming Plaintiff and his reputation. Thus, Defendant's acts constitute "communication" into this state and jurisdiction is proper under subsection (1)(b) of Florida's Long-Arm Statute.

*(2) **Jurisdiction is Proper Under Subsection (1)(f)(2) of the Florida Long-Arm Statute***

Subsection (1)(f)(2) states that personal jurisdiction exists when a defendant causes "…injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury…products, materials or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the in the ordinary course of commerce, trade, or use."

Defendant's recommended findings contained nothing more than a vicious and hateful attack through false and malicious statements regarding Plaintiff's ethics, morality, character,

and honesty, which was intended to destroy Plaintiff and his reputation so that he could no longer engage in his conservative religious, legal, and political activism, which Defendant adamantly opposed. Thus, in order to accomplish his objective, Defendant intentionally and willfully manufactured false facts out of whole cloth, as evidenced by his malicious accusation in his recommended findings that Plaintiff "inappropriately touched" his children. Defendant not only intended that these false statements be widely published but also to specifically reach this jurisdiction, by directing his "communication" into this state, where Plaintiff has substantial ties. Defendants statements and recommended findings did, in fact, reach this district, where it was viewed, read, and further disseminated in the ordinary course of commerce, trade, and use.

Defendant's malicious accusations and recommended findings led to the wide-spread dissemination and publication of these spiteful and vindictive personal attacks by Defendant. In fact, the numerous media publications, blogs, and internet postings make specific reference to Defendant's recommended findings and, further exasperating the damage caused to Plaintiff, these media outlets mischaracterize these already malevolent allegations into their own manufactured libelous statements that Plaintiff was indicted and convicted of the crime of child sexual abuse, which is completely untrue. Thus, Defendant caused severe injury to Plaintiff in this jurisdiction, injuring him in his reputation, profession, and personal life. Through Defendant's unwarranted and injudicious attacks on Plaintiff, Defendant effectively stifled Plaintiff's legal and political advocacy, and also impeding on his ability to practice law.

### B.      Defendant Loeb has Sufficient Minimum Contacts with Florida

To exercise personal jurisdiction over a nonresident defendants, the defendant must has sufficient minimum contacts with the forum state such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice in violation of Due Process. See

*PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.* 598 F.3d 802, 807-808 (11th Cir. 2010). In analyzing the due process requirement, it is clear that Defendant had more than sufficient minimum contacts such that he should reasonably anticipate being haled into court in this district as a result of his substantial connection.

Defendant clearly purposely availed himself of the privilege of conducting activities in Florida and purposely directed his activities at residents of this state. In fact, this action brought by Plaintiff results from Plaintiff's injuries arising out of such activities maliciously and unlawfully engaged in by Defendant. Notably, Defendant's conduct, and his unwarranted and malicious 93-page recommended decision, touched upon one of the most significant issues affecting Plaintiff, an American citizen who resides in the state of Florida and in this district, which is his primary personal and legal community.

Defendant specifically directed his unlawful, vindictive, and deliberate acts, towards Florida in particular, as Defendant was fully aware that Plaintiff would suffer the most harm in this jurisdiction given Plaintiff's significant and substantial contacts with Florida, not only as a citizen of this state, but also through his extensive and continuing legal and political advocacy in this state and district. Moreover, since Defendant sought to have his recommended decision reach the public and, more importantly, to be widely published through numerous mediums, including the internet, thereby ensuring that residents of Florida would view Defendant's damaging and false "findings." Thus, it is clear that Defendant, in pursuing his malicious motive of destroying Plaintiff based on extreme animus toward Plaintiff's religious and political beliefs and legal activist, intentionally directed his activities to this state and to its residents. Moreover, Defendant's deliberate acts directly and proximately caused Plaintiff to suffer substantial harm and significant damages, including, in part, lost earnings, lost career and business opportunities,

loss of reputation, humiliation, embarrassment, and severe mental and emotional anguish and distress. As an attorney and legal activist in Florida, Plaintiff's injuries, particularly his loss of reputation arose most predominantly in this state.

Additionally, Defendant purposely availed himself to this Court's jurisdiction and has more than sufficient contacts with this district such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice, as evidenced by Defendant's position and involvement in numerous associations and activities that spread throughout the nation, including Florida. Specifically, Defendant was a member of the American Arbitration Association for approximately 26 years, and heard more than over 400 cases, while promoting the mission of the organization, which sought alternative dispute resolution throughout the country, including Florida. See http://domestic.cuyahogacounty.us/en-US/Lawrence-Loeb.aspx; Exhibit "A." Defendant was also a member of the Federal Mediation and Conciliation Services Labor Panels, an independent agency providing conflict resolution services for labor-management relationships. *Id*. The FMCS is headquartered in Washington, D.C. and its public functions are delivered nationally, including through offices in Miami, Florida, and Orlando, Florida. See http://www.fmcs.gov/internet/categoryList.asp?categoryID=20 and also, http://www.fmcs.gov/internet/itemDetail.asp?categoryID=107&itemID=16282; Exhibit "B." In addition, Defendant was also an arbitrator for the coal industry and the United States Postal Service. In fact, Defendant was assigned to arbitrate a labor dispute matter in a case filed in the U.S. District Court for the District of Columbia. (*U.S. Postal Service v. American Postal Workers Union AFL-CIO,* 536 F. Supp. 2d. 12 (2008).[3]

---

[3] Tellingly, the Court in the D.C. case made numerous comments in its Memorandum Opinion regarding Defendant Loeb's flawed and unreasonable arbitration of the disputed matter. Specifically, the Court's Memorandum Opinion explicitly discussed Defendant Loeb's flawed

In addition to deliberately and intentionally harming Plaintiff in Florida, as Defendant was fully aware that Plaintiff's residence and legal practice were located in Florida, Defendant has also engaged in conduct and activities on a national level. Compl. ¶20. Specifically, as evidenced above, Defendant has engaged in conduct that effected persons across the United States, including residence of Florida, such as Plaintiff. Thus, it is evident that Defendant has sufficient contacts with this jurisdiction to reasonably expect to be haled into this court.

## **PLAINTIFF'S CLAIM WAS BROUGHT IN THE PROPER VENUE**

The federal statute on venue, 28 U.S.C. §1391(2), states in relevant part: "A civil action may be brought in…a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated…" "[P]roper venues are not mutually exclusive. Indeed, venue is subject to the choice of the plaintiffs, not the defendant." *McClure,* 301 F. Supp. 2d at 569. "In considering a motion to dismiss for improper venue, 'the court may consider matters outside the pleadings such as affidavit testimony.'" *BP Prods. N. Am., Inc. v. Super Stop 79, Inc.*, 464 F. Supp. 2d 1253, 1256 (S.D. Fla. 2006) (quoting *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004)) Furthermore, a motion to dismiss on venue grounds should be denied where the action is brought in a district that "'has a substantial connection to the claim, whether or not other forums

---

analysis of the issues in the case and his manifest disregard of established precedent and the authority granted by the National Agreement at issue. Memo. Opinion in *U.S. Postal Service* at pp. 4. In fact, the Court made the following statements: "Arbitrator Loeb, for reasons unclear to this Court, failed to appreciate the rulings by the Fourth Circuit…His decision, simply stated exceeded the authority granted by the National Agreement;" "[Arbitrator Loeb's] failed analysis constitutes the type of manifest disregard of the National Agreement that requires this Court to vacate the Loeb Award;" "Arbitrator Loeb inexplicably attempts to distinguish the Fourth Circuit's decision from the present case…Loeb fails to provide any reasoned basis for distinguishing the Fourth Circuit opinion. Indeed, Arbitrator Loeb relies heavily on the dissent of the Fourth Circuit opinion in his analysis;" "…this Court finds that Arbitrator Loeb exceeded his authority and that his Award must be vacated." Memo. Opinion in *U.S. Postal Service* at pp. 3, 4.

had greater contacts.'" *Bay County Democratic Party*, 340 F. Supp. 2d at 808-09 (quoting *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998)).

Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and Plaintiff's choice in venue should be granted deference. Specifically, a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district and in this state. Additionally, Plaintiff not only resides in this state but also engages in and conducts substantial business activities in Florida and this district. More significantly, Defendant's malicious and false findings was, in fact, intentionally directed towards this state and, more specifically, this district, where Plaintiff has substantial ties and connections through his personal, legal, and political activities. Plaintiff was indisputably injured in his reputation and standing in the community in this district as a result of Defendant's conduct. In fact, Defendant's unlawful acts intentionally impeded on Plaintiff's ability to form legal relationships with clients, to earn a livelihood, and to remain in good standing, particularly among the legal community. Thus, it is indisputably that Defendant has caused significant harm to Plaintiff and Plaintiff's reputation, particularly as a legal and political activist, especially in Florida and this district where he has substantial ties.

## <u>DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(b)(6) SHOULD BE DENIED</u>

Under Federal Rule 12(b)(6), the court must deny Defendant's Motion to Dismiss unless it appears to a certainty that Plaintiff would be entitled to no relief under any state of facts which could be proved to support a claim. *Banco Continental v. Curtiss National Bank of Miami Springs,* 406 F.2d 510, 514 (5th Cir.1969); *see also Gibson v. United States*, 781 F. 2d 1334, 1337 (9th Cir.  1986). In considering a motion to dismiss, all allegations of material facts alleged in the complaint must be taken as true and construed in the light most favorable to the nonmoving party. *Allman v. Phillip Morris, Inc.,* 865 F. Supp. 665, 667 (S.D.Cal.1994), citing

*Love v. United States*, 915 F.2d 1242, 1245 (9ᵗʰ Cir. 1989). Plaintiff has more than sufficiently

pled claims arising from Defendant's conduct and the Motion to Dismiss should be denied.

      A.     **Plaintiff Sufficiently Pled Facts Showing that He Is Entitled To Relief For Defendant's Violation Of His 1ˢᵗ Amendment Right To Freedom Of Religion**

      The First Amendment to the United States Constitution guarantees the right to free

exercise of religion and the right to free speech. U.S. Const. Amend. 1. The Amendment

provides, in pertinent part, that "Congress shall make no law respecting an establishment of

religion, or prohibiting the exercise thereof; or abridging the freedom of speech…" *Id*.

      Defendant, acting under the color of authority of Cuyahoga County, Ohio maliciously

and repeatedly manufactured false facts and engaged in countless personal attacks against

Plaintiff's religious beliefs, morality, ethics, character, and honesty for his belief in Jesus Christ

as the Lord and Savior and Song of God. Compl. ¶26. Defendant, who is Jewish, took extreme

offense to and in a disparaging way mocked Plaintiff's religious belief, as evidenced in his

dishonest, 93-page recommended decision. Defendant even questioned and invented the "fact"

that Plaintiff was raised a Christian, despite the fact that the record is devoid of any such

conclusion. Compl. ¶¶15, 16. Defendant further denigrated, mocked, and intentionally

mischaracterized Plaintiff's dual beliefs and heritage, even speculating, gratuitously and without

any basis, where Plaintiff took his children to Jewish services or whether Plaintiff celebrated any

of the Jewish holidays with the children Compl. ¶17. Evidencing Defendant's disdain, loathing,

and hatred for Plaintiff and his religious views, Defendant outrageously and hatefully referred to

Plaintiff as "evil" and his former spouse as "good." Compl. ¶26. As a direct result of these

actions and remarks, and statements issued in his decision, Defendant unlawfully deprived

Plaintiff of his First and Fourteenth Amendment right to free exercise of religion, causing

Plaintiff significant harm, both personally and professionally. Compl. ¶27. Thus, in light of the

above, Plaintiff has satisfied the pleading requirements of stating facts sufficient to show he is entitled to relief for Defendant's constitutional violations.

B.      **Plaintiff Sufficiently Pled Facts Showing that He Is Entitled To Relief For Defendant's Violation Of His 1st Amendment Right To Freedom Of Religion**

The purpose behind the First Amendment includes protecting unpopular individuals from retaliation, particularly as our society accords greater weight to the value of free speech than to the dangers of its misuse. *McIntyre v. Ohio Elec. Comm*., 514 U.S. 334, 346 (1955). In fact, Government action, such as the conduct engaged in by Defendant, designed to retaliate against and dull political expression strikes at the heart of the First Amendment. *Daniels v. William*.

For inexplicable reasons, Plaintiff's then counsel gave Defendant a copy of Plaintiff's book "Whores: Why and How I Came to Fight the Establishment," an autobiography that discuss how and why Klayman came to Christ as well as his legal activism against the Clintons and other liberal Democrats and others. Compl. ¶6. As such, and from Plaintiff's testimony, Defendant was fully aware of Plaintiff's religious and political belief and that Plaintiff is a conservative activist who has brought many successful lawsuits and taken hard hitting legal actions against Democrats such as Bill and Hillary Clinton, President Barack Obama, and others. Compl. ¶¶6, 20.

Defendant Loeb, a Jewish liberal, took offense to both Plaintiff's belief in Christianity and his legal advocacy that went after the prominent Democrats such as the Clintons and President Obama. As a result, Defendant violated Plaintiff's right to speech by retaliating against and punishing Plaintiff for his well-established religious beliefs and practices and conservative legal and political activism that did not coincide with his own religious and leftist political beliefs. Compl. ¶31. It was because of Plaintiff's religious and conservative beliefs that Defendant Loeb chose to purposely publish false findings of "fact" that he maliciously intended to have picked up, mischaracterized and published in the media and by internet bloggers to

destroy Plaintiff. Compl. ¶¶20, 23. These findings were intended to "snuff out" and stifle Plaintiff's conservative legal activism by harming him personally and professionally, effectively thwarting Plaintiff's ability to credibly further engage in his activism. Compl. ¶24. Striking at the heart of the First Amendment, Defendant malicious and intentionally retaliated against Plaintiff with callous disregard for his guaranteed constitutional rights. Compl. ¶32. Thus, Plaintiff has sufficiently pled facts showing Defendant's violation of his right to free speech.

C.    **Defendant Violated Plaintiff's Equal Protection Rights**

The equal protection clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ct*., 473 U.S. 432, 439 (1985). To show a violation of equal protection, plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).

Defendant indisputably violated Plaintiff's right to equal protection under the law by illegally discriminating him and making malicious, false, and factually baseless recommended findings against him because of Plaintiff's religious, legal, and political conservative beliefs and practices, which indisputably constitutes intentional discrimination directed at identifiable classes. Compl. ¶37. It is simply because of Plaintiff's beliefs, practices, and activism, and his success and high profile in this regard, that Defendant issued for publication and for use by the media and Plaintiff's adversaries false recommended findings that severely damaged Plaintiff in his trade, profession, and personally. Compl. ¶37. Plaintiff has satisfied pleading requirements.

D.    **Judicial Immunity Is Not Applicable.**

In order for Defendant to be immune from action her decisions must have been judicial in nature and not done in clear absence of all jurisdiction. *See Ashelman v. Pope,* 793 F.2d 1072,

1075 (9th Cir. 1986) (en banc). Indeed, for judicial immunity to apply Defendant must have been performing an integral part of the judicial process. *See Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. Unit A March 1981); *Wickstrom v. Ebert,* 585 F. Supp. 924, 934 (E.D. Wis. 1984); *Smallwood v. United States,* 358 F. Supp. 398, 404 (E.D. Mo.), aff'd mem., 486 F.2d 1407 (8th Cir. 1973). In applying these principles, it is clear that judicial immunity is inapplicable in this case and Defendant is not immune from his actions since: (1) Defendant is not a judicial officer and (2) Defendant's actions were done in clear absence of all jurisdiction and were so factually baseless and hateful as to go far beyond his authority.

As set forth in the Complaint, Defendant is "a lawyer and not a judge or judicial officer." Compl. ¶4. This admission comes from the Cuyahoga County Domestic Relations Court website, which states: "Magistrates are **attorneys** appointed by the Administrative Judge to whom motions or trials are referred for disposition." (emphasis added). See "Cuyahoga County Domestic Court website;" Exhibit "C." Defendant is simply an attorney and is unable to claim now, for his own benefit, that he is anything more.

Moreover, Defendant's actions were done in clear absence of all jurisdiction. Defendant, under the color of authority, set out to attack Plaintiff's religious beliefs, morality, ethics, character and honesty for his belief in Jesus Christ as the Lord and Savior and Son of God in violation of his right of freedom of speech and religion. Defendant knew that his recommended findings would be widely published in this district, nationally and internationally, and would severely harm Plaintiff in his trade, profession, and personally. Compl. ¶4. Defendant's findings were so far from the truth and so significantly misconstrued that they were no longer written as part of a judicial proceeding, but were instead nothing more than a "hit job" in the guise of a court document. Evidence of some of the hate-filled findings was set forth in great detail in the

Complaint and reiterated above. See generally Compl. at pp. 10-14. To afford judicial immunity for Defendant's unprecedented, malicious 93-page, single spaced diatribe, (which, if double spaced, novel near 200 pages of hate filled rhetoric), would clearly violate the policy behind the immunity, and would unfairly protect Defendant for his vindictive and unlawful acts while presiding over a custody case as an attorney.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court strike Defendant's Motion to Dismiss, as there is currently pending before this Court a Motion to Disqualify Defendant's Counsel, given the manifest conflict of interest and the numerous ethical violations that would result from Hannan's legal representation of Defendant. In the alternative, if the Court does not strike Defendant's Motion to Dismiss, Plaintiff respectfully requests that this Court deny Defendant's Motion to Dismiss in its entirety, given that this Court clearly has personal jurisdiction over Defendant, that venue is proper in this district, and that Plaintiff has pled facts sufficient to state causes of action entitling him to relief. Additionally, despite Defendant's far-reaching claim that he is subject to immunity for his action, Defendant fails to acknowledge that judicial immunity is not applicable to cases, such as this one, where Defendant maliciously and hatefully sought to destroy Plaintiff, simply for exercising his rights.

Dated: August 30, 2013

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
2775 NW 49th Ave, Suite 205-346
Ocala, FL 34483
Email: leklayman@gmail.com
Tel: (310) 595-0800

Pro se

## CERTIFICATE OF SERVICE

I certify that on the 30th day of August 2013, the foregoing Opposition to Motion to Dismiss was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Larry Klayman*
Larry Klayman, Esq.
2775 NW 49th Ave, Suite 205-346
Ocala, FL 34483
Email: leklayman@gmail.com
Tel: (310) 595-0800

Pro se