**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **LARRY KLAYMAN,** | **Civil Action No.  5:13 CV 0267** |
| **Plaintiff,** | |
| **v.** | |
| **LAWRENCE R. LOEB,** | |
| **Defendant.** | |

## SUPPLEMENTAL MEMORANDUM SETTING FORTH NEW CASE AUTHORITY SHOWING JUDICIAL IMMUNITY DOES NOT APPLY

### STATEMENT OF FACTS

Plaintiff Larry Klayman ("Mr. Klayman") hereby submits this Supplemental

Memorandum in support of Plaintiff's Opposition to Defendant's Motion to Dismiss, filed on

August 30, 2013, to provide the Court with newly uncovered authority evidencing the

inapplicability of judicial immunity to Defendant Lawrence R. Loeb ("Defendant"), an attorney

who presided over Mr. Klayman's child custody hearing. Compl. ¶4.[1] Proceeding under the guise

of a judicial officer, **which he is not,** Defendant viciously and unnecessarily smeared Mr.

Klayman on nearly every page of his unprecedented 93-page single spaced recommended

"findings," issued in the custody proceeding, unjustifiably mocking, ridiculing, and disparaging

Mr. Klayman's religious beliefs, legal profession, and conservative legal and political activism,

---

[1] As set forth in the Complaint, Defendant Loeb is "a lawyer and not a judge or judicial officer."  Complaint ¶4**.**
This admission comes from the Cuyahoga County Domestic Relations Court website, which states: "Magistrates are
**attorneys** appointed by the Administrative Judge to whom motions or trials are referred for disposition."  (Emphasis
added).  Defendant Loeb is nothing more than an attorney.

in addition to vilifying Mr. Klayman through ad hominen personal assaults, all with the purpose of having them published into the public domain to harm and violate the civil rights of Mr. Klayman. Compl. ¶4.

Defendant's false "findings" lacked any legal significance or relevance to the actual custody proceeding but rather, were needlessly made to maliciously destroy Mr. Klayman, personally and professionally, and to effectively destroy Mr. Klayman's conservative legal and political advocacy by significantly harming Mr. Klayman's reputation. Compl. ¶19. Defendant's outrageous, reprehensible, and discriminatory acts far transcended any bounds of legitimate conduct by intentionally violating Mr. Klayman's constitutional rights as retaliation for exercising his constitutionally protected freedom of religion and speech. In doing so, Defendant undeniably acted purely out of hatred, loathing, and antipathy towards Mr. Klayman in order to effectively thwart Mr. Klayman's conservative legal and political advocacy, which were contrary to Defendant's own liberal political views. Compl. ¶1.

**Fully aware of Mr. Klayman's high profile legal and political activism, his involvement in matters of national concern and public interest (See www.freedomwatchusa.org), as well as Mr. Klayman's status as a public figure who is well known by the media, Defendant undoubtedly issued his false "findings" with knowledge aforethought that his "conjured up" falsely manufactured statements would be thrust into the public domain, picked up and republished by the media, and widely disseminated in this district, throughout the United States, and even internationally. Compl. ¶¶6, 20. In fact, Defendant deliberately acted with full knowledge that his findings would undoubtedly be used by Mr. Klayman's adversaries to further damage and destroy him. Compl. ¶¶ 21, 23.**

Perhaps most damaging was Defendant's so-called "finding" that Mr. Klayman "inappropriately touched his children," which was based on Mr. Klayman's former spouse's outrageous and conveniently timed allegation in a custody proceeding, made out of the blue, that Mr. Klayman had sexually abused his son. Notably, there was no evidence to this effect but instead substantial evidence to the contrary, clearly establishing that Defendant's false "finding" that Mr. Klayman inappropriately touched his children was completely unsubstantiated. Specifically, the Department of Children and Families found that this allegation was "unsubstantiated" and the district attorney, after a thorough investigation by the sheriff's office, empathetically declined to prosecute. Compl. ¶12. Moreover, Mr. Klayman had also voluntarily taken a polygraph examination, which he easily passed. Compl. ¶12.

As Defendant obviously intended, the manufactured false statements in his proposed findings have since been mischaracterized and published widely in the media and on the internet, by Mr. Klayman's adversaries, such venomous and radical-leftist publications as City Pages, Phoenix New Times, Right Wing Watch of the atheist and socialist group People for the American Way, Wonkette, and a host of growing media and internet publications. Compl. ¶ 23. In fact, evidencing the wide dissemination of Defendant's malicious and degrading false "findings," these media publications, blogs, and other internet postings specifically reference Defendant's manufactured false statements, obviously in their own attempt to hide behind their own libelous false statements against Mr. Klayman. *Id*. Some examples of publications that have republished Defendant's false statements, particularly in regard to Defendant's unsubstantiated and malicious finding that Mr. Klayman inappropriately touched his children, include an an article published by Addicting Info, entitled "**Birther Lawyer Still Calling For Armed Revolution Against**

**'Mullah-In-Chief,''** dated September 19, 2013, which relies on Defendant's false findings, in

stating:

- "Of course, **Larry Klayman fails to mention the times he sexually abused his children** or how he damaged his former employer and held an affair with a staffer at his officer. His numerous frivolous lawsuits were dismissed. **Of course, that was the judges at fault, not Mr. Klayman, right? It was his former employer's fault, his children's fault. Everybody's fault but his own…He failed as a husband, a father, a lawyer, and to be a decent human being. Now he would rather burn down the United States than face the truth that he is wrong.**" (Exhibit 1).

It is indisputable that this defamatory and degrading false statement is undoubtedly based

on Defendant's malicious "findings" stating: "But it was not the [Mr. Klayman] who was at fault,

**… it was always somebody else who was flawed or at fault, never him."** Decision at 83

(Emphasis added). Compl. ¶17(p).

City Pages published an article entitled **"Bradlee Dean's attorney, Larry Klayman,**

**allegedly sexually abused his own children,"** dated September 28, 2012, in which it discussed

Defendant's unsubstantiated allegation that Mr. Klayman inappropriately touched his children,

again relying on Defendant's "findings" against Mr. Klayman. City Pages concludes the article

by disparagingly stating:

- "Turns out, gays aren't the only ones capable of disturbing, criminal sexual behavior—apparently even conservative straight guys tight with Bradlee Dean can turn out to be total creeps."

Nearly all of the statements included in City Pages' article were directly taken from

Defendant's unprecedented 93-page single space recommended findings that were nothing more

than insurmountable false statements intended to be disseminated in the public domain to

significantly harm Mr. Klayman and Mr. Klayman's reputation. Further, an article posted by the

Wonkette, entitled "**Judicial Watch Founder/Clinton Nemesis Larry Klayman Might Have**

**Touched His Children In Their Swimsuit Areas,"** dated September 30, 2012, states:

- **"Well this is gross and awful. Larry Klayman, who made his bones with Judicial Watch, which was constantly suiting Bill Clinton every time he sneezed (with his penis) who most recently has been writing for WND and representing totally rad heavy metal children's entertainer Bradlee Dean, may have sexually abused his own children! Ha? Ha? Hilarious?** Specifically, Larry Klayman was appealing a Cuyahoga County court order regarding visitation and his wife's attorney's fees, and the court found that previous magistrates had not been in error when they took away his visitation rights and awarded his ex-wife a shitload of money." (Exhibit 3).

The article further cites to various portions of Defendant's recommended findings, made

purely out of disdain and hatred towards Plaintiff:

> (¶25) The issues raised by Klayman involve credibility assessments made by the magistrate. Klayman challenges these findings. **The magistrate heard evidence from the children's pediatrician who reported allegations of sexual abuse to children services, and from a social worker at children services who found that sexual abuse was "indicted." Although the social worker's finding was later changed to "unsubstantiated" when Klayman appealed, the magistrate explained that the supervisor who changed the social worker's finding did not testify.** The magistrate pointed out that he was obligated to make his own independent analysis based upon the parties and the evidence before him. In doing so, the magistrate found on more than one occasion [Klayman] act[ed] in a grossly inappropriate manner with the children. His conduct may not have been sexual in the sense that he intended to or did derive any sexual pleasure from it or that he intended his children would. That, however, does not mean that he did not engage in those acts or that his behavior was proper.
>
> (¶26) The magistrate further found it significant that although Klayman denied any allegations of sexual abuse, he never denied that he did not engage in inappropriate behavior with the children. The magistrate further found it notable that Klayman, "for all his breast beating about his innocence ***[he] scrupulously avoided being questioned by anyone from [children services] or from the Sheriff's Department about the allegations," and that **he refused to answer my questions, repeatedly invoking his Fifth Amendment rights, about whether he inappropriately touched the children.** "Even more disturbing" to the magistrate was the fact that Klayman would not even answer the simple question regarding what he thought inappropriate touching was. The magistrate stated that he could draw an adverse inference from Klayman's decision not to testify to these matters because it was a civil proceeding, not criminal."

Again, these statements were directly taken from Defendant's malicious recommended

findings, which is exactly what Defendant maliciously intended on happening, knowing that they

would be publicly disseminated and would reach the public and be used by Mr. Klayman's

adversaries, as evidenced above, not only to ruin Mr. Klayman's legal profession but effectively

thwart his conservative advocacy. Following the theme of City Pages, and similar publications,

another article posted by Bo News, entitled "Bradlee Dean's attorney, Larry Klayman, allegedly

sexually abused his own children," dated September 28, 2012, stating:

- **"Well this week brought some uncomfortable news for the tracksuit-wearing homophobic -- his notorious lawyer, the presumably straight Larry Klayman, has allegedly sexually abused his children."** (Exhibit 4).

In an article posted by the Phoenix New Times, entitled **"Birther Lawyer Fighting Joe**

**Arpaio Recall Was Found to Have "Inappropriately Touched" Kids,**" dated February 22,

2013, states:

- "Thanks to our sister paper in Minneapolis, City Pages, we have an appellate court ruling from Ohio in which [Mr. Klayman] was unsuccessful in appealing a ruling about the terms of his parental rights stemming from his divorce…part of that appeal was [Mr. Klayman] asking the court to review 'the trial court's finding that [Mr. Klayman] engaged in appropriate touching of his child is contrary to the manifest weight of the evidence and an abuse of discretion.'" The articles further states that "a magistrate judge weighed the evidence and **found that [Mr. Klayman] acted 'in a grossly inappropriate manner with the children."** (Exhibit 5).

An article entitled **"Remember Larry Klayman, founder of Judicial Watch and**

**Freedom Watch? He sexually abused his own kids,"** (Exhibit 6), dated September 28, 2012,

made similar false allegations of sexual child abuse as did another article entitled **"Larry**

**Klayman, founder of radical rightwing "Judicial Watch," who constantly sued Bill Clinton,**

**charged with doing you-know-what to his children"** (Exhibit 7). As discussed above, these

allegations made in Defendant's findings were absolutely unsubstantiated and false. Yet, Mr.

Klayman's adversaries clearly used the findings and conveyed the allegations as fact. Similarly,

Right Wing Watch published an article entitled, "Birthers of the World Unite: Larry Klayman to

Represent Group Defendant Joe Arpaio," dated February 21, 2013, stating:

- **"Poor legal advice aside, Klayman's selection to represent the group may not be boon to the image of Arpaio, who is currently under fire for hiring a child-sex offender for his armed posse to guard schools."** (Exhibit 8).

These publications continue to proliferate and increase each day, using Defendant's initial malicious attacks as justification to further attack and harm Mr. Klayman in order to continue destroying his ability to practice law and his legal and political activism, in addition to damaging him in his personal life. Compl. ¶¶23, 24.

Despite Defendant's outrageous, vindictive, and discriminatory conduct Defendant now has the gall to contend that his egregious conduct is fully shielded by judicial immunity. Defendant evidently misunderstands the applicability of judicial immunity, failing to recognize that, even if he was a judge, which he is not, the doctrine does not protect him from such contemptible and egregious civil rights violations done solely in retaliation for Mr. Klayman's religious beliefs and conservative legal and political activism, which were contrary to Defendant's own religious practices and leftist political beliefs. Compl. ¶24. Thus, given the outrageousness and the severe harm caused by Defendant's conduct, Defendant is not precluded from liability under the doctrine of judicial immunity, even in the unlikely event he was considered a judicial officer, which he is not.

A.     **Defendant's Disparaging, Unrelated Findings Regarding Mr. Klayman's Religious Beliefs**

Evidencing the fact that Defendant acted far beyond any scope of judicial conduct, Defendant branded Mr. Klayman as "evil" and his former spouse as "good," which is clearly conduct that is way out of line for any judicial officer. Who ever heard of something like this, that is unless the magistrate intended to harm Mr. Klayman and his civil rights! Defendant, however, obviously intending to thrust this outrageous and vicious statement into the public

domain to destroy Mr. Klayman and his reputation as an attorney and as a conservative activist, outrageously wrote:

- "[T]he fight would become one of apocalyptic proportions, **a struggle between forces of good [Mr. Klayman's ex-spouse] versus the forces of evil [Mr. Klayman].**" (Recommended Findings at 3). Compl. ¶ 16.

It is hateful that a magistrate would blatantly refer to one party as "evil" and the other party as "good," unless the magistrate was set out on destroying a party to a proceeding, particularly a party who happens to be a public figure, as is the case here. Intending for his deceptive, misleading, mendacious remarks to reach the general public to fatally harm their perception of Mr. Klayman, Defendant's cynical, belittling, hateful, and outrageous statement, went far beyond the pale such that Defendant, even if he was an actual judicial officer, would not be subject to the protections of judicial immunity.

Moreover, Defendant, a "conventional Jew," took extreme offense to Mr. Klayman's testimony that he is both Jewish and Christian (that is "messianic") and taught his children the same thing, even buying his children necklaces composed of Stars of David with Christian Crosses engraved them. Compl. ¶14. Defendant, acting out of hatred and disdain towards Mr. Klayman, seized the opportunity to further mock Mr. Klayman and disparage him for religious beliefs by inventing the "fact" that Mr. Klayman was raised as a Christian and "speculating" as to whether Mr. Klayman even took his children to Jewish services or celebrated any Jewish holidays with the children. Compl. ¶16. Specifically, Defendant wrote:

- There is also no proof that the Defendant (Mrs. DeLuca) confiscated the Crosses with the Stars of David that [Mr. Klayman] sent to the children. **The crosses took on special significance for the [Mr. Klayman] who saw them tied up with his "Jewish heritage," which comes from his mother who was Jewish**. **He was however, raised a Christian.** He told the court that he attends Christian services at Ted Baer's house in California and goes to an Orthodox service in Beverly Hills. While he may have attended Jewish services during his marriage to the Defendant, he did not take the children with him. He also failed to mention that he took the children to Jewish services whenever they

were with him in Florida or when he lived in Cleveland. Further, there is no evidence that he has celebrated any of the Jewish holidays with the children, discussed what it means to be Jewish with them or introduced them to Jewish history or culture. Decision at 62. Compl. ¶16.

Defendant intentionally mischaracterized and mocked Mr. Klayman's dual religious beliefs and heritage and even went so far as to outrageously question whether Mr. Klayman had, in fact, introduced his children to their Jewish heritage. Compl. ¶16. Defendant had no legal or other right to question, mischaracterize and mock Mr. Klayman's dual religious beliefs other than to show disdain, loathing, and hatred for him, both as a result of his religiosity and his legal and political activism. In punishing and retaliating against Mr. Klayman for his religious views, Defendant clearly violated Mr. Klayman's civil liberties, including his right to freedom of religion, as these statements predictably found their way into the public domain.

**B.**     **Defendant's Disparagement and Denigration of Mr. Klayman's Legal Profession and Legal and Political Activism**

Defendant further disparaged and mocked Mr. Klayman in regard to Mr. Klayman's profession as an attorney and a highly recognized legal and political activist, vilifying and degrading Mr. Klayman's achievements as a conservative public interest lawyer as well as his conservative political beliefs as expressed by Mr. Klayman's lawsuits against prominent political figures. Specifically, Defendant states the following:

- **"[Mr. Klayman] is a lawyer license to practice in two or three states and the District of Columbia. He is proud that he has been involved in major cases including suits against powerful domestic and international adversaries as well as the government. It is impossible to believe that someone with his experience, with his training and his background would not have known that once he answered the questions,** once he denied engaging in any of the activity he was asked about **he could not invoke his Fifth Amendment** right against self-incrimination because he had waived it." Compl. ¶17(i).

As evidenced by Defendant's hateful and snide remark, Defendant deliberately violated Mr. Klayman's right to speech by retaliating against and punishing Mr. Klayman for his highly

recognized conservative legal and political activism that did not coincide with Defendant's own

leftist political views. More significantly, Defendant was fully aware that such calculated

conduct in undermining Mr. Klayman's conservative views would be thrust into the public

domain and would consequently damage Mr. Klayman in his reputation and his conservative

legal and political advocacy, degrading his profession by writing:

- The statement, [Mr. Klayman] told the court, was a 'word choice' by the person who wrote up the report… **It was an utterly implausible statement from a man who graduated from both college and law school…"** Compl. ¶17(e).

In this astounding statement, ironically from someone who completely disregarded the

fundamental protections of the U.S. Constitution in his own personal vendetta to punish Mr.

Klayman for his religious and political beliefs and advocacy, Defendant berates Mr. Klayman's

intelligence as an attorney and undermines his practice of law merely because of his alleged

word choice. Fully aware that his "findings" would enter the public domain and effect the views

of the general public regarding Mr. Klayman's legal advocacy, Defendant disparaged Mr.

Klayman's profession with rank speculation and undue disdain, intending to raise considerable

doubts among the general public regarding Mr. Klayman's legal advocacy and profession.

C.    **Defendant's Personal Attacks Against Mr. Klayman:**

Defendant's spiteful and hateful assaults, that were ultimately intended to reach Mr.

Klayman's community as well the public in general, undoubtedly evidences Defendant's

personal hatred, disdain, and loathing towards Mr. Klayman and his persistent effort to

significantly destroy and damage Mr. Klayman's reputation, character, and credibility, which he

succeeded at. As way of example, some of Defendant's egregious attacks found in Defendant's

so-called findings, made solely to harm the public's perception of Mr. Klayman and to damage

Mr. Klayman's reputation, include:

- "**[Mr. Klayman's] allegations … say more about [Mr. Klayman's] imagination and view of the world** than they do about the Defendant's parenting abilities or her as a person." Decision at 48 (Emphasis added). Compl. ¶17.

- "The only conclusion that the Magistrate can reach from the record (sic) is either that **[Mr. Klayman] has an utterly perverse view of the Defendant, rooted in fantasy not reality**, or he deliberately hurled this calumny at her as a means of striking out against her." Decision at 53 (Emphasis added). Compl. ¶17(m).

- "**The [Mr. Klayman's] side of the conversation makes for good reading, but again it is not the whole truth….**" Decision at 73 (Emphasis added). Compl. ¶17(n).

- "The [Mr. Klayman] had to deny that it was, though, because **to acknowledge that it was genuine would have ruined his carefully built-up fantasy that the Defendant deliberately kept him in the dark…**" Decision at 81 (Emphasis added). Compl. ¶17(o).

- "But it was not the [Mr. Klayman] who was at fault, **… it was always somebody else who was flawed or at fault, never him.**" Decision at 83 (Emphasis added). Compl. ¶17(p).

- "… the Magistrate finds that the [Mr. Klayman's] testimony is entitled to no weight. **He is simply not credible.**" Decision at 87 (Emphasis added). Compl. ¶17(q).

- "Instead, the Magistrate finds **given [Mr. Klayman's] almost total lack of credibility** and his repeated efforts to paint almost everyone in the worst possible light that his description of his son's and Mr. DeLuca's (Ms. Luck's name changed after she got remarried) behavior **is nothing more than another attempt to depict events not as they happened, but as he wants the Court to believe that they did.**" Decision at 63 (Emphasis added). Compl. ¶17(b).

- "…[Mr. Klayman] sought to portray himself as a warm, affectionate parent who deeply loves his children and who wants nothing more than to provide for them and to spend time for them. **While the Magistrate has no doubt that the [Mr. Klayman] loves his children in his own way,** the bulk of his claims, especially those relating to the Defendant both as a person and a parent, are so devoid of the factual content as to amount to fantasy." Decision at 46 (Emphasis added). Compl. ¶16.

In attacking Mr. Klayman in the most significant and intimate aspects of his life, including his religious beliefs, legal profession, and legal and political advocacy, Defendant, out of his hatred and loathing of Mr. Klayman, seized the opportunity to retaliate against and punish Mr. Klayman by dishonestly ridiculing and viciously attacking Mr. Klayman to the highest extent,

seeking to have his so-called "findings" be picked up by the media and widely disseminated to the public in his malicious effort to destroy Mr. Klayman and his conservative and influential legal and political advocacy. Compl. ¶ 20, 21. It is indisputable that Defendant could have made his findings without engaging in a demeaning, belittling, and contemptuous attack against Mr. Klayman. Yet, Defendant went far beyond the pale such that, even if Defendant was a judicial officer (which he is not), judicial immunity was not intended to protect such egregious conduct that was purely intended to harm Mr. Klayman and his reputation among the general public.

## THE LAW

As emphasized by the U.S. Supreme Court, "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." *United States v. Lee,* 106 U.S. 196 (1882). As such, the Supreme Court has recognized that judicial immunity only applies if the judge was acting in his judicial capacity and not in purely administrative acts and is held liable when he has acted in the absence of all jurisdiction. *Stump v. Sparkman*, 435 U.S. 349, 357 (1978).

Thus, in determining whether to grant any type of immunity, including judicial immunity, courts have to balance the benefits of civil liability, compensating victims and encouraging lawful conduct, against the undesirable consequences, intimidating decision-makers and undermining their independence. *Forrester v. White*, 484 U.S. 219, 223 (1987). In fact, the Supreme Court "has been cautious in recognizing claims that government officials should be free of the obligation to answer for their acts in court." It is the burden of the individual seeking absolute immunity to show that it is justified for the functions he performs. *Burns v. Reed*, 500 U.S. 478, 486 (1991). In addition, the Supreme Court has "generally been quite sparing in its

recognition of claims to absolute official immunity." *Forrester*, 484 U.S. at 223-224. Absolute immunity is "strong medicine" that is justified only when the threat to effective performance of office is "very great." *Improper Expansion of Absolute Judicial Immunity* at 270-271.

In addressing Defendant's conduct through the false lens of the judicial immunity jurisprudence leads to the conclusion that Defendant is not immune from liability for his unlawful acts of deliberately and maliciously violating Mr. Klayman's constitutional rights. Rather, Defendant should be held accountable for his non-judicial conduct in engaging in systematic violations of Mr. Klayman's constitutional rights for his own personal vendetta to destroy Mr. Klayman in the public domain.[2] To allow the expansion of judicial immunity to apply to Defendant would clearly frustrate the enforcement of civil-rights laws, deny Mr. Klayman of a remedy, fail to deter future constitutional violations and misconduct, and hinder the development of constitutional standards.

### *(1)     Defendant Is Not Protected By Judicial Immunity Because He Is Not A Judicial Officer Nor Was He Engaging In Judicial Acts.*

Defendant, who was merely an attorney appointed for the simple purpose of *assisting* the Administrative Judge in Mr. Klayman's limited child custody hearing, was accordingly subject to the authority of the Administrative Judge.[3] Thus, unlike the authority granted to the Administrative Judge, who is an actual judge and judicial officer, Defendant indisputably lacked

---

[2] An individual should not be protected by the doctrine of judicial immunity "who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good…To deny recovery to a person injured by the ruling of a judge acting for personal gain or out of personal motives would be 'monstrous.'" *Pierson v. Ray*, 386 U.S. 547 (1967).

[3] "The Judges of the Domestic Relations Court have all the powers relating to all divorce, dissolution of marriage, legal separation, and annulment cases, except in cases…The Administrative Judge is administrator of the domestic relations division and its subdivisions and departments and has full charge of the employment, assignment, and supervision of court employees, including sole determination of compensation, duties, expenses, allowances, hours, leaves, and vacations. Magistrates are attorneys appointed by the Administrative Judge to whom motions or trials are referred for disposition…" Cuyahoga County Domestic Relations Court Website, http://domestic.cuyahogacounty.us/en-us/judges-magistrates.aspx

the authority to make the ultimate findings in family custody case and to issue the final disposition of the matter.

Despite being appointed for the simple task of providing assistance to the administrative family court judge, and the limited scope of Defendant's authority given his status as an attorney, Defendant flouted and violated his responsibilities and duties and, instead, acted in a manner that went far beyond the role of a neutral arbiter of disputes. Rather than "assist" the Administrative Judge, Defendant acted solely for the purpose of vindicating his own personal objectives by belittling and disparaging Mr. Klayman for his religious and political beliefs, and violating Mr. Klayman's civil rights. By issuing what was merely a *recommended* decision, not the ultimate disposition of the case, replete with manufactured false allegations and statements hateful and disparaging Mr. Klayman for his religious and political beliefs, Defendant intentionally sought to have his so-called "findings" thrust into the public domain, knowing that they would be further published, especially by Mr. Klayman's adversaries, and would, thus, significantly harm and destroy Mr. Klayman and his reputation as an attorney and a conservative activist.

In light of the above, Defendant is clearly not a judicial officer and his position as an "assistant" to the Administrative Judge does not grant him judicial immunity for his egregious misconduct, which are in no way adjudicatory in nature. Specifically, Defendant's unlawful conduct in issuing a maliciously false recommended decision that lacked any legal significance or relevance is far from constituting a judicial act subject to immunity. Rather, Defendant's conduct had nothing to do with the custody hearing but everything to do with destroying Mr. Klayman, personally and professionally, outside of the courtroom in the public domain.

    *(2)*    ***Judicial Immunity Does Not Immunize Defendant For His Intentional Violations Of Mr. Klayman's Constitutional Rights And, Even If Defendant Was a Judicial Officer, Which He Is Not, His Actions Are Not Protected By Judicial Immunity.***

To expand the judicial immunity defense to Defendant, who deliberately sought to thrust his manufactured false recommended findings into the public domain to destroy Mr. Klayman personally and professionally, would seriously undermine civil-rights enforcement, deny Mr. Klayman a remedy for the deprivation of his constitutional rights, and hinder the development of constitutional standards. See Margaret Z. Johns, *A Black Robe is Not a Big Tent: The Improper Expansion of Absolute Judicial Immunity to Non-Judges in Civil-Rights Cases*, 59 SMU L. Rev. 265, 270-71 (2006) (hereafter "*Improper Expansion of Absolute Judicial Immunity*").

As aptly pointed out in *Improper Expansion of Absolute Judicial Immunity*, specifically in regards to Bivens actions and claims brought pursuant to 42 U.S.C. §1983, as is the case here, "Nothing in the language of §1983 suggests that Congress intended to extend official immunity defenses to defendants in civil-rights action. And the legislative history does not demonstrate that Congress intended to preserve immunities. Indeed the entire goal of the statute was to impose liability on state officials who violated constitutional rights, and it is doubtful that Congress intended to insulate officials who violate civil rights by granting them immunity." *Id.* at 270.

Moreover, even if the Court were to entertain the notion that Defendant was a judicial officer, which he is not, even a judicial officer loses the protection of judicial immunity when he acts in a way that is beyond the role of a neutral arbiter of disputes, such as engaging in actions not related to any case pending before him or when the judge's actions are motivated solely by a desire to vindicate his own personal interests. *Brewer v. Blackwell*, 692 F.2d 387 (5th Cir. 1982) citing *Harper v. Merckle*, 638 F.2d 848 (5th Cir. 1981); *Lopez v. Vanderwater*, 620 F.2d 1229 (7th Cir. 1980), cert. dismissed, 449 U.S. 1028 (1980). In *Brewer*, plaintiff, as is true here, sued a justice of the peace both for violations of their civil rights and for state tort claims. The district court rendered a directed verdict in favor of the justice of the peace on the grounds of judicial

immunity. However, the U.S. Court of Appeals for the Fifth Circuit reversed. It held that, when judicial officers act in a "nonjudicial" capacity, they are not immune from liability for that conduct. Moreover, "when it is beyond reasonable dispute that a judge has acted out of personal motivation and has used his judicial office as an offensive weapon to vindicate personal objectives…" his acts are nonjudicial. *Brewer v. Blackwell*, 692 F.2d 387 (5th Cir. 1982) citing *Harper,* 638 F.2d at 850.

In *Gregory v. Thomson,* 500 F.2d 59 (9th Cir. 1974), a plaintiff also sued a judge for violations of his civil rights. On appeal, the judge contended that he was precluded from liability given the protections of the doctrine of judicial immunity. The U.S. Court of Appeals for the Ninth Circuit unequivocally rejected the judge's contentions, holding that it lacked any merit. In reaching its determination, the Ninth Circuit examined the purpose underlying the doctrine of judicial immunity. "Official immunity, after all, is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of the government." Moreover, as the Ninth Circuit further recognized, "Immunity… 'is not for the protection of benefit of a malicious or corrupt judge…" Consistent with this, the U.S. Supreme Court has held unambiguously that the doctrine of immunity should not be applied broadly and indiscriminately, but should be invoked only to the extent necessary to affect its purpose. See *Doe v. McMillan*, 412 U.S. 306, 319-325 (1973). Thus, it is within a judge's power to protect the sanctity and dignity of courtroom proceedings." *Mullins v. Oakley*, 437 F.2d 1217, 1218 (4th Cir. 1971). In applying these principles, the U.S. Court of Appeals for the Fourth Circuit held the judge's assault on the plaintiff to effectuate the judge's inherent power to maintain order in the courtroom does not insulate the judge from liability under the judicial immunity doctrine. "More importantly, we cannot believe that the purpose of the judicial immunity doctrine – to promote

'principled and fearless decision making' – will suffer in the slightest if it held that judges who physically assault persons in their courtrooms have no automatic immunity." *Gregory,* 500 F.2d at 64.

This case is analogous to *Gregory v. Thomson,* 500 F.2d 59 (9th Cir. 1974), in that Defendant's unjustified verbal attacks assaulted with his published smear campaign, intentionally seeking to destroy Mr. Klayman in every possible way by issuing a recommending finding, which was knowingly going to be public disseminated, that is so far from truth that it was clearly intended to sabotage Mr. Klayman personally and professionally. Like in *Gregory*, the judicial immunity doctrine does not apply here and Defendant's acts of maliciously and unjustifiably engaging in a diatribe of verbal assaults against Mr. Klayman that he knew would be widely disseminated publicly, particularly to such a damaging extent on Mr. Klayman's well being and livelihood are not entitled to automatic immunity.

In fact, even an actual judge or judicial officer would lose the protection of judicial immunity by acting in this manner, going far beyond the role of a neutral arbiter of disputes by taking actions motivated solely by his desire to vindicate his personal interest, particularly in reaching Defendant's goal of destroying Mr. Klayman personally, professionally and his success as a legal and political activist. More specifically, clearly driven by his own antipathy towards Mr. Klayman's religious views and conservative legal, and political advocacy, Defendant's continued and outrageous purported "findings" against Mr. Klayman were made solely to destroy Mr. Klayman, both personally and professionally, knowing that the recommended decision would undoubtedly be thrust into the public domain, deliberately seeking to destroy Mr. Klayman's conservative, religious, legal and political activism, which were contrary to Defendant's strong religious beliefs and liberal views.

More significantly, Defendant was undeniably fully aware that, given Mr. Klayman's high-profile legal and political activism and involvement in matters of national concern and in the public interest, that his malicious and false recommended "findings" would be picked up and disclosed to members of the media and internet bloggers who would undoubtedly mischaracterize Defendant's statements and then widely publish and disseminate them. In fact, Defendant's findings were indeed widely circulated in the media, both locally and nationally, which in fact continues to perpetuate further publications that rely on Defendant's "findings" to avoid the consequences of their own libelous statements.

Thus, as these publications are proliferating and growing each day, particularly by legal adversaries who are using Defendant's malicious attacks to destroy Mr. Klayman's conservative political and legal advocacy and destroy his ability to practice law and continue in his advocacy, Mr. Klayman has incurred great and significant harm and damage that continues to increase daily. Given the significant and substantial harm caused by Defendant's unnecessary, malicious, and intentionally false ad hominen attacks Defendant should be held accountable for his egregious conduct and is clearly not entitled as a matter of fact and law to invoke the protections of judicial immunity to avoid liability.

## **CONCLUSION**

In light of Defendant's hateful agenda and intent to destroy Mr. Klayman and his reputation so that he could no longer effectively engage in further conservative religious legal and political activism contrary to Defendant's religious legal and political beliefs and practices, Defendant acted with the intent and for the purpose of violating Mr. Klayman of his rights secured under the U.S. Constitution, including his exercise of freedom of religion and speech, acting with the particular intent to chill Mr. Klayman's conservative public advocacy.

In perpetuating the deprivation of Mr. Klayman's fundamental civil liberties, Defendant deliberately issued his outrageous and manufactured false "findings" with full knowledge that his hateful and misleading diatribe would be picked up and published by the press, especially by Mr. Klayman's adversaries, to further destroy Mr. Klayman and his reputation, particularly as an individual who is highly recognized and well-known to the media.

Having so profoundly disgraced the magistrate position he was entrusted with, Defendant may not now hide behind the false cloak of judicial immunity after engaging in such egregious, malicious, and vindictive conduct that undermines not only the core principles of our judicial system but challenges the importance of the U.S. Constitution in preserving and protecting fundamental individual rights and civil liberties. While judicial immunity is not applicable in this case, based upon the applicable facts and laws provided above, no one is above the law, even those who are temporarily entrusted to protect and preserve justice by enforcing the law. For all these reasons, Mr. Klayman respectfully requests that this Court deny Defendant's Motion to Dismiss in its entirety.

Dated: September 30, 2013

<div style="margin-left: 50%;">

Respectfully submitted,
 */s/ Larry Klayman*
Larry Klayman, Esq.
2775 NW 49th Ave, Suite 205-346
Ocala, FL 34483
Email: leklayman@gmail.com
Tel: (310) 595-0800

Pro se

</div>